1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF WASHINGTON
9                                 AT SEATTLE
10

11   CATHERINE BLAYLOCK, et al.,

12                 Plaintiff,
                                              CASE NO. C06-1667JLR
13           v.
                                              ORDER
14   FIRST AMERICAN TITLE INSURANCE
     CO., et al.,
15
                 Defendants.
16

17

18                               **I.  INTRODUCTION**

19          This matter comes before the court on the motion to dismiss of Defendant Chicago

20
     Title Insurance Co. ("Chicago Title") (Dkt. # 19); the joint motion to dismiss of
21
22   Defendants First American Title Insurance Co. ("First American"), Pacific Northwest

23   Title Insurance Co. ("Pacific Northwest"), Transnation Title Insurance Co.

24
     ("Transnation"), and Commonwealth Land Title of Puget Sound ("Commonwealth")
25
26   (Dkt. # 20); and the joint motion to dismiss of Defendants Ticor Title Insurance Co.

27

28

     ORDER – 1

("Ticor") and Fidelity National Title Insurance Co. ("Fidelity") (Dkt. # 46).[1]  Although the parties have requested oral argument, the court finds these motions appropriate for disposition based on the parties' briefs and accompanying declarations.  For the reasons stated below, the court DENIES Defendants' motions to dismiss (Dkt. ## 19, 20, 46).

## II.  BACKGROUND

This suit is brought by homeowners who purchased title insurance from Defendants coincident with the purchase or refinancing of their real estate.  Plaintiffs are Catherine Blaylock, Jill Macinnes, Romulo and Purita Lorenzo, Mark Braunstein, Janet Hunt, Bruce Baglien, Nestor and Merlina Picardal, Edward and Jody Zumwalt, and Walter Segerra.  Plaintiffs seek certification to represent a class of persons who purchased title insurance from Defendants during the period in which Defendants allegedly paid inducements to developers, lenders, loan brokers, real estate agents, and other real estate settlement service providers (generally, "middlemen") to obtain their referrals.  Plaintiffs seek damages and injunctive relief based on Defendants' inducements to such middlemen.  The inducements and corresponding referrals are alleged to have been illegal because they were in contravention of Washington law prohibiting title insurance companies from providing anything of value in excess of $25 in a 12-month period to any person as an inducement, payment, or reward for placing or causing title

---

[1]Although Defendants filed separate motions to dismiss, the court largely considers the motions together, as they raise the same arguments.  The court distinguishes between the motions where relevant to its analysis.

ORDER – 2

insurance business to be given to the company.  RCW §§ 48.30.140, 48.30.150; WAC § 284-30-800.  Plaintiffs allege that they were harmed by Defendants' violations of these statutes and regulations.

Defendants' pattern of conduct challenged in this suit was made public two days before Plaintiffs filed their complaint, in an investigative report issued by the Washington State Office of the Insurance Commissioner (the "OIC") that, in a tone deeply critical of the title insurance industry, concluded that eleven title insurance companies regularly violated the regulations prohibiting inducements to middlemen in a position to refer business to the title insurance companies.  Rummage Decl., Ex. C.  Plaintiffs allege that these practices violated the Washington Consumer Protection Act, RCW § 19.86, *et seq.*, and the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq.*

**A.    Washington's Regulatory Scheme for Title Insurance**

All insurance in Washington, including title insurance, is regulated under the Washington Insurance Code, Title 48 of the Washington Revised Code.  The Code creates an Insurance Commissioner, RCW § 48.02.010, and authorizes the Commissioner to enforce the provisions of the Insurance Code, "make reasonable rules and regulations for effectuating any provision of [the C]ode," and "conduct investigations to determine whether any person has violated any provision of" the Code.  RCW § 48.02.060; see also Retail Store Employees Union v. Wash. Surveying & Rating Bureau, 558 P.2d 215, 222 (Wash. 1976).  The Commissioner is provided with the authority to issue cease and desist

ORDER – 3

orders against violators of the Code or OIC regulations.  RCW § 48.02.080(3)(a).  The Commissioner is also empowered to seek the involvement of the judicial system by bringing actions to enjoin violations and enforce orders previously issued, or by certifying the facts of a violation of a penal section of the Code to a prosecutor.  Id. § 48.02.080.

The Code also sets out a comprehensive scheme for setting insurance premiums. RCW §§ 48.19.010, 48.19.501.  Insurance rates are subject to the general substantive requirement of not being "excessive, inadequate, or unfairly discriminatory."  Id. § 48.19.020.  The Code specifies various considerations that must be taken into account in the setting of rates, including past and prospective loss experience, hazards, profitability, and expenses.  Id. § 48.19.030(3); see also WAC § 284-24-065 (providing detailed guidelines for determining whether a rate is reasonable, as opposed to excessive, inadequate, or discriminatory).  Moreover, the Code mandates that the Commissioner conduct a review of proposed rates and requires insurers to submit extensive documentation in support of their rate-setting request.  RCW § 48.19.040.  The Commissioner undertakes a review of a given rate filing "as soon as reasonably possible," and imposes a waiting period of no less than 30 days for that review to take place, at the end of which the filing becomes effective if not disapproved by the Commissioner.  Id. §§ 48.19.060, 48.19.100.  The Commissioner can also order that a filing become ineffective after this waiting period, provided that notice is provided and a hearing is conducted with the affected insurers.  Id. § 48.19.120(1).

ORDER – 4

Furthermore, the Code anticipates consumer involvement, and provides a mechanism for their input on rate-setting.  Pursuant to a written request and a reasonable fee, insurers are required to provide affected consumers "all pertinent information" relating to the rate.  Id. § 48.19.300.  Insurers are also required to provide "reasonable means" by which persons aggrieved by a rate can, upon written request, be heard.  Id. § 48.19.310.  Any party affected by the action of the insurer upon such a request can appeal the insurer's decision to the Commissioner for further review.  Id.  Moreover, "[a]ny person aggrieved" by a filing can make a written application directly to the Commissioner for a hearing.  Id. § 48.19.120(3).  The Commissioner must hold the hearing within 30 days of receiving the application if he or she finds that it was made in good faith, that its grounds justify the hearing, and that the applicant would be aggrieved if the grounds are established.  Id.

Title insurance is specifically exempted from this rate-setting regulatory scheme. Id. § 48.19.010(f).  Comparatively, title insurance rates are subjected to a relatively superficial system of regulation.  Title insurance rates, like other insurance rates, may not be "excessive, inadequate, or unfairly discriminatory."  Id. § 48.29.140(1).  As with other insurance rates, title insurance rate schedules must be submitted to the Commissioner, and are subjected to a waiting period[2] before they go into effect.  Id. § 48.29.140(2).  The Commissioner is empowered to modify title insurance rates found after a hearing to be

---

[2]In contrast to the waiting period of no less than thirty days for general insurance rates, title insurance rates become effective 15 days after the filing.  Id. §§ 48.19.060, 48.29.140(2).

ORDER – 5

1
2
3
4
5
6
7
8
9
10
11
12

"excessive, or inadequate, or unfairly discriminatory." Id. § 48.29.140(3).  The

similarities between title insurance rate regulation and general insurance rate regulation,

however, end here.  The most salient difference is that the Code does not require the OIC

to review title insurance rates.  Although the rates are submitted, and the Commissioner

has 15 days in which review could occur before the rates go into effect, the Code does

not actually mandate review.  Title insurers are not required to consider the factors listed

under § 48.19.030(3) in setting their rates, nor are they required to submit the

documentation laid out in § 48.19.040 in order to demonstrate compliance with the

standards set out in WAC § 284-24-065.

13
14
15
16
17
18
19
20
21
22
23
24

     In addition, the Code provides no mechanism by which consumers may provide

input on rate-setting for title insurance.  Unlike other insurers, title insurers are not

required to provide consumers access to the information pertinent to the setting of the

rates upon request.  Title insurers are not obligated to provide aggrieved persons

reasonable means to be heard, nor does the Code provide a mechanism by which an

aggrieved person can petition the Commissioner for a hearing as to title insurance rates.

Thus, the Code does not require any review by the agency and does not provide

alternative means for constituents to participate in the rate-setting process.  For title

insurance, then, the rates are largely set by the title insurers themselves.

25
26
27
28

ORDER – 6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.      The OIC Report[3]**

On October 17, 2006, Washington State Insurance Commissioner, Mike Kreidler, issued a report entitled "An Investigation into the Use of Incentives and Inducements by Title Insurance Companies" (the "OIC Report").  Rummage Decl., Ex. C.  The OIC Report chronicled the findings of a ten-month study undertaken by the agency after marketing abuses by the title insurance industry attracted national attention.  The OIC Report attributed the problem to the reverse competitive nature of the title insurance market.  "Reverse competition means that title companies solicit business from the other major players in the home sale scenario – real estate agents and agencies, banks, lenders, builders, developers and others."  Id. at 3.  Because reverse competition does not benefit consumers, the OIC places strict limits on the incentives that can be provided to middlemen in a position to steer business toward title insurers.  RCW§§ 48.30.140, 48.30.150.

Following the lead of the Colorado Department of Insurance and the National Association of Insurance Commissioners, the OIC engaged in a study of the major title companies operating in the greater Seattle metropolitan area, in an attempt to determine whether Washington title insurance companies were flouting statutory limits on

---

[3]As a general rule, courts do not consider matters outside the pleadings on a motion to dismiss for failure to state a claim upon which relief may be granted.  There is an exception to this general rule, however, for documents referred to in the complaint, which form the basis of plaintiff's claims.  See Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994) (overruled on other grounds by Galbraith v. County of Santa Clara, 307 F.3d 119, 1127 (9th Cir. 2002)).

ORDER – 7

inducements to middlemen, and if so, the extent of their violations.  The OIC demanded

and studied employee expense reports and general ledgers from an 18-month period, and

an additional holiday season outside that 18-month period.  The OIC Report concluded,

"the use of inducements and incentives by title companies to obtain title insurance

business in Washington appeared to be widespread and pervasive." Id. at 5.  It

determined that title insurance companies use a series of schemes to influence middlemen

to steer business their way, most of which were some version of "wining and dining."

Title companies provided gifts to middlemen; invited them on golf outings, sporting

events, and ski trips; hosted parties for them; and underwrote their costs for real estate

advertising.  The OIC Report indicated that these practices would have an inevitable

effect on consumers: "While there may not appear to be a clear connection between these

illegal practices and a negative impact on consumers, . . . [i]t is undeniable that these

practices cost money, and it's clear that the consumer, who ultimately pays for the

coverage, is the only source of money for these illegal expenses." Id.

C.    **Plaintiffs' Claims**

Plaintiffs bring claims pursuant to Washington Consumer Protection Act, RCW §

19.86, *et seq.*, and the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq*.

   1.    **The Washington Consumer Protection Act**

The Washington Consumer Protection Act ("CPA") provides broadly that "[u]nfair

methods of competition and unfair or deceptive acts or practices in the conduct of any

ORDER – 8

trade or commerce are hereby declared unlawful."  RCW § 19.86.020.  Specifically,

Plaintiffs claim that the conduct described in the OIC Report violates RCW §§ 48.30.140,

48.30.150, and WAC § 284-30-800, giving rise to claims under the CPA.  The Insurance

Code specifically provides that "[n]o insurer, general agent, agent, broker, solicitor, or

other person shall, as an inducement to insurance, or in connection with any insurance

transaction, provide in any policy for, or offer, or sell, buy, or offer or promise to buy or

give, or promise, or allow to, or on behalf of, the insured or prospective insured in any

manner whatsoever . . . [a]ny prizes, goods, wares, or merchandise of an aggregate value

in excess of twenty-five dollars."  RCW § 48.30.150.  The Insurance Commissioner

implemented this statute in a regulation entitled "Unfair practices applicable to title

insurers and their agents," which provides, in pertinent  part:

> (1)   RCW 48.30.140 and 48.30.150, pertaining to "rebating" and "illegal
> inducements," are applicable to title insurers and their agents. Because
> those statutes primarily affect inducements or gifts to an insured and an
> insured's employee or representative, they do not directly prevent similar
> conduct with respect to others who have considerable control or influence
> over the selection of the title insurer to be used in real estate transactions.
> As a result, insureds do not always have free choice or unbiased
> recommendations as to the title insurer selected. To prevent unfair
> methods of competition and unfair or deceptive acts or practices, this rule
> is adopted.

> (2)   It is an unfair method of competition and an unfair and deceptive act or
> practice for a title insurer or its agent, directly or indirectly, to offer,
> promise, allow, give, set off, or pay anything of value exceeding twenty-
> five dollars, calculated in the aggregate over a twelve-month period on a
> per person basis in the manner specified in RCW 48.30.140(4), to any
> person as an inducement, payment, or reward for placing or causing title
> insurance business to be given to the title insurer.

ORDER – 9

(3)   Subsection (2) of this section specifically applies to and prohibits inducements, payments, and rewards to real estate agents and brokers, lawyers, mortgagees, mortgage loan brokers, financial institutions, escrow agents, persons who lend money for the purchase of real estate or interests therein, building contractors, real estate developers and subdividers, and any other person who is or may be in a position to influence the selection of a title insurer, except advertising agencies, broadcasters, or publishers, and their agents and distributors, and bona fide employees and agents of title insurers, for routine advertising or other legitimate services.

WAC § 284-30-800.  The phrase "unfair methods of competition and unfair or deceptive acts or practices" in this regulation precisely echoes the language of the CPA.

Plaintiffs allege that these provisions of the CPA and the Insurance Commissioner's regulations render Defendants' conduct a *per se* unfair or deceptive practice.  Moreover, they allege that they were harmed by these practices.[4]  Plaintiffs request an injunction preventing Defendants from engaging in these practices, compensatory damages for the harm caused by the allegedly unfair and deceptive practices, treble damages, and attorneys' fees.

## 2.     The Real Estate Settlement Procedures Act

The Real Estate Settlement Procedures Act ("RESPA") provides, in relevant part: "[n]o person shall give and no person shall accept any fee, kickback, or thing of value

---

[4]Specifically, Plaintiffs quote the language of the OIC Report that "[i]t is undeniable that these practices cost money, and it's clear that the consumer, who ultimately pays for the coverage, is the only source of money for these illegal expenses."  Plaintiffs allege that "Defendants' unfair and deceptive conduct caused injury to the business and property of Plaintiffs and the Class in an amount to be proven at trial."  Second Am. Compl. at 14.

ORDER – 10

pursuant to any agreement or understanding, oral or otherwise, that business incident to

or a part of a real estate settlement service involving a federally related mortgage loan

shall be referred to any person." 12 U.S.C. § 2607(a). Plaintiffs allege that Defendants

engaged in a practice of giving things of value on the understanding that title insurance

will be referred to them. Plaintiffs allege that they have purchased title insurance from

Defendants who engaged in such conduct, and accordingly, that they are entitled to

statutory damages in an amount equal to three times the amount of damages of title

insurance premiums involved in Defendants' violations pursuant to 12 U.S.C. §

2607(d)(2).[5] They further request fees and costs.

### III.  ANALYSIS

Defendants seek dismissal of Plaintiffs' claims under Federal Rule of Civil

Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. The

court may dismiss Plaintiffs' claims under Rule 12(b)(6) only if it "appears beyond

doubt" that Plaintiff "can prove no set of facts in support of [his] claim which would

entitle [him] to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). In deciding a Rule

12(b)(6) motion, the court must accept as true all well-pleaded allegations of fact in the

complaint and construe them in the light most favorable to the plaintiff. Zimmerman v.

City of Oakland, 255 F.3d 734, 737 (9th Cir. 2001). Dismissal is warranted only if it

---

[5] 12 U.S.C. § 2607(d)(2) provides: "[a]ny person or persons who violate the prohibitions
or limitations of this section shall be jointly and severally liable to the person or persons charged
for the settlement service involved in the violations in an amount equal to three times the amount
of any charge paid for such settlement service."

ORDER – 11

"appear[s] to a certainty that the plaintiff would not be entitled to relief under any set of facts that could be proved." Plaine v. McCabe, 797 F.2d 713, 723 (9th Cir. 1986). Despite the liberal standard, "[c]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." In re Verifone Sec. Litig., 11 F.3d 865, 868 (9th Cir. 1993).

## A.     The Filed Rate Doctrine

Defendants argue that the filed rate doctrine[6] precludes Plaintiffs' claims because Plaintiffs' suit essentially challenges rates that are established by a regulatory agency. The filed rate doctrine is a "court-created rule to bar suits against regulated utilities involving allegations concerning the reasonableness of the filed rates." Tenore v. AT&T Wireless Servs., 962 P.2d 104, 108 (Wash. 1998). Originally developed as a bar to antitrust actions challenging the reasonableness of carrier rates, the filed rate doctrine stands for the principle that the approval of an agency "in effect, establish[es] the lawfulness of the [challenged] rates." Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409, 416 (1986).

The doctrine has its origins in Keogh v. Chicago & Northwestern Ry. Co., 260 U.S. 156 (1922). Keogh involved a challenge brought by a manufacturer against interstate freight carriers who formed an association and cooperated to set a uniform, excessive rate. Plaintiff challenged the rates under antitrust laws, alleging that he was

---

[6]This doctrine is also referred to as the filed tariff doctrine, or the Keogh doctrine.

ORDER – 12

entitled to competitive rates.  The carriers defended the rates by pointing out that they had

been submitted to the Interstate Commerce Commission ("ICC") and were not made

effective until after extensive hearings and ICC approval.  The Court held that plaintiff's

suit was barred because (1) Keogh had a remedy before the ICC against unreasonably

high or discriminatory rates, (2) a successful suit would result in discriminatory rates for

Keogh, thwarting Congress's primary purpose in requiring uniform rates, (3) measuring

damages would require the court to recalculate rates that should be the exclusive province

of the ICC, and (4) the damages suffered by Keogh, a shipper, were speculative because

it could pass along the alleged overcharges to its customers.  Keogh, 260 U.S. at 162-65.

Even in the antitrust context, the Court's justification for the doctrine has been

repeatedly called into question since its inception in the 1920s.  For instance, in Square

D, 476 U.S. at 415-24, the Court refused to overrule Keogh only because it had been an

"established guidepost at the intersection of the antitrust and interstate commerce

statutory regimes for some 6½ decades" that Congress had not elected to extinguish.  Id.

at 423.  At the same time, the Square D Court "assume[d] that petitioners are correct in

arguing the Keogh decision was unwise as a matter of policy."  Id. at 420.[7]  The Ninth

_____

[7]The Court acknowledged the doctrine's policy defects as set forth by the Second Circuit
below in Square D.  Id. at 423 (citing Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 760
F.2d 1347, 1352-53 (2d Cir. 1985) (noting that since the doctrine's inception, the Supreme Court
has permitted antitrust challenges to activities regulated by administrative agencies; rejected the
argument that a plaintiff cannot recover damages it was able to pass on to its customer in the
antitrust context; and in many later cases, directed the suspension of judicial proceedings pending
the referral of an issue to the ICC)).

ORDER – 13

Circuit recently observed in <u>Knevelbaard Dairies v. Kraft Foods, Inc.</u>, that the doctrine's purposes have been reduced to preventing discriminatory rates and judicial interference with rate-setting by an administrative agency.  232 F.3d 979, 992 (9th Cir. 2000). "Although the doctrine has been questioned by many including the Supreme Court itself, it lives on to a limited extent."  <u>Id.</u> (citing federal common carrier and public utility cases).

Situated as these cases are in the context of antitrust challenges to rates approved by federal agencies, <u>Square D</u> and <u>Keogh</u> are not perfectly applicable to the facts of this case, which involve a challenge under consumer protection laws to a rate approved by a state regulatory agency.  Moreover, subsequent cases illustrate that the logical underpinnings of this federal common law doctrine have been called into question since its origination.  At the very least, these opinions counsel for caution in applying the doctrine to new contexts.

Of course, some courts have extended the <u>Keogh</u> doctrine from its original context of antitrust challenges to carrier rates.  In the context of challenges to the rates of federal agencies, it has been held to bar, for instance, fraud challenges to electric utility rates approved by the Federal Power Commission, <u>Montana-Dakota Util. Co. v. Northwestern Pub. Serv.</u>, 341 U.S. 246 (1951), and RICO challenges to the utility rates approved by the Federal Communications Commission, <u>Wegoland Ltd. v. Nynex Corp.</u>, 27 F.3d 17 (2d Cir. 1994).  Moreover, courts have concluded that the "rationales underlying the filed rate

ORDER – 14

doctrine apply equally strongly to regulation by state agencies." <u>Wegoland</u>, 27 F.3d at

20.  Many courts, both state and federal, have concluded that the doctrine bars actions in

the general context in which Defendants seek to apply it here – that of challenges to rates

set by state agencies regulating insurance premiums.  <u>See</u> <u>e.g.</u>, <u>Rios v. State Farm Fire</u>

<u>and Cas. Co.</u>, 469 F. Supp. 2d 727 (S.D. Iowa 2007); <u>Korte v. Allstate Ins. Co.</u>, 48 F.

Supp. 2d 647 (E.D. Tex. 1999); <u>Morales v. Attorneys' Title Ins. Fund, Inc.</u>, 983 F. Supp.

1418 (S.D. Fla. 1997); <u>Chermer v. State Farm Fire and Cas. Co.</u>, 721 N.W.2d 307 (Minn.

2006); <u>N.C. Steel, Inc. v. Nat'l Council on Comp. Ins.</u>, 496 S.E.2d 369 (N.C. 1998);

<u>Prentice v. Title Ins. Co. of Minn.</u>, 500 N.W.2d 658 (Wis. 1993); <u>Commn. ex rel.</u>

<u>Chandler v. Anthem Ins. Co.</u>, 8 S.W.3d 48 (Ky. Ct. App. 1999); <u>Byan v. Prudential Ins.</u>

<u>Co. of Am.</u>, 662 N.Y.S.2d 44 (N.Y. App. Div. 1997).  <u>But see</u> <u>Hanson v. Acceleration</u>

<u>Life Ins.</u>, A3-97-152, 1999 WL 33283345 (D.N.D. Mar. 16, 1999).

　　　It is clear, however, that whatever the weight of the precedent from other states as

to the doctrine's applicability in the insurance context, this case is controlled by the state

law of Washington.  <u>See</u> <u>Knevelbaard</u>, 232 F.3d at 992 (applying California state law in

rejecting application of the filed rate doctrine to cases involving rates set by state

regulatory agencies).  "[W]hen interpreting state law, federal courts are bound by

decisions of the state's highest court."  <u>Assurance Co. of Am. v. Wall & Assocs. LLC of</u>

<u>Olympia</u>, 379 F.3d 557, 560 (9th Cir. 2004) (quotation omitted).  If there is no controlling

decision of the state's highest court, a federal court is obligated to "predict how the

ORDER – 15

highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." Id. In the absence of convincing evidence that the state supreme court would decide differently, a federal court must follow the decisions of the state's intermediate appellate courts. Id.

Washington has little case law on the filed rate doctrine. The parties have not cited, nor is the court aware of, a decision discussing the application of the doctrine to challenges to insurance rates, let alone title insurance rates, nor even rates set by a state regulatory agency. There is a single decision by the Washington Supreme Court discussing the application of the doctrine, Tenore, 962 P.2d at 108, and a single decision by the Washington Court of Appeals applying the doctrine. Hardy v. Claircom Commc'n Group, 937 P.2d 1128 (Wash. Ct. App. 1997). In Tenore, a putative class of consumers challenged AT&T's practice of rounding up the last fraction of a minute spent in a cellular phone call and billing for the entire minute. The class alleged breach of contract, negligent misrepresentation, fraud, and violation of the CPA. The Tenore Court described the filed rate doctrine as "a court-created rule to bar suits against regulated utilities involving allegations concerning the reasonableness of the filed rates," which "provides, in essence, that any 'filed rate' . . . is per se reasonable and cannot be the subject of legal action against the private entity that filed it." Tenore, 962 P.2d at 108. After noting that the purposes of the doctrine are "(1) to preserve the agency's primary

ORDER – 16

jurisdiction to determine the reasonableness of rates, and (2) to insure that regulated entities charge only those rates approved by the agency," id., the Court indicated concern that the doctrine not be applied so rigidly that the its application strays from these purposes. Id.

This discussion of the doctrine is dicta, because the Tenore Court ultimately determined that the filed rate doctrine was not implicated since cellular telephone service providers are specifically exempted from the FCC's filing requirements, and therefore do not file rates. Id. at 110. Therefore, the only guidance this court has from the highest court in Washington is a statement of the primary purposes of the doctrine and a cautionary note that it should not be applied rigidly in situations that do not advance its central purposes.[8]

Pursuant to the guidance provided by the Washington Supreme Court, then, it is useful to examine whether the principles underlying the filed rate doctrine would be

---

[8]The decision of the Washington Court of Appeals provides little, if any, additional guidance. In Hardy, plaintiffs filed suit against AT&T Wireless and Airfone alleging negligent misrepresentation, fraud, breach of contract, and violations of the CPA. They challenged defendants' practice of measuring the length of a call on an air-to ground telephone by rounding up the last fraction of a minute spent. The court described the filed rate doctrine as a "court-created rule designed to make rapid, efficient nationwide and radio communication service available." Hardy, 937 P.2d at 1131. The court found that because the FCC regulates air-to-ground rates, the filed-rate doctrine barred plaintiffs' claims where neither the FCC nor the court has the power to retroactively alter a filed rate. Id. To be sure, in Hardy, the court invoked and applied the filed rate doctrine, which at first blush lends support to Defendants' argument that it should be applied to the present case. However, the Washington Court of Appeal's application of the doctrine to a rate set by a federal agency in the telecommunications context does not mandate its application to a rate set by a state agency, particularly in the context of the minimal regulations governing the title insurance industry.

ORDER – 17

served by its application in this case.  The animating purposes of the doctrine described in

Tenore and Hardy have been elucidated by the Second Circuit as (1) a concern with

potential discrimination in rates between ratepayers, Wegoland, 27 F.3d at 19, also

known as the "nondiscrimination" strand, Marcus v. AT&T Corp., 138 F.3d 46, 58 (2d

Cir. 1998), and (2) a concern with preserving the exclusive role of agencies in approving

reasonable rates, the "nonjusticiability" strand.  Id.

The concern with potential discrimination between rate-payers is marginally

pertinent to the present case.  Plaintiffs do not directly challenge the reasonableness of

the rate, or the quality of the service.  Rather, Plaintiffs challenge the fact that Defendants

paid illegal inducements to obtain referrals from middlemen.  While it is true that the

damages in this case may implicate title insurance premiums, the nondiscrimination

purpose behind the doctrine is implicated here only indirectly, if at all.[9]

---

[9]Moreover, although the analysis turns on state law, the court is inclined to agree with the Ninth Circuit that even if the state regulatory agency intended for the rates to be applied equally, this is not such a strong consideration that other unlawful acts giving rise to independent causes of action should be extinguished by this equality principle.  See Brown v. Ticor Title Ins. Co., 982 F.2d 386, 394 (9th Cir. 1992).  In Brown, the Ninth Circuit declined to apply the filed rate doctrine in the context of an antitrust challenge against title insurance companies regulated under Arizona and Wisconsin law.  In response to the defendants' argument that they were required to file their rates with state regulatory agencies, the court reasoned, "if those rates were the product of unlawful activity prior to their being filed and were not subjected to meaningful review by the state, then the fact that they were filed does not render them immune from challenge.  The absence of meaningful state review allows the insurers to file any rates they want.  Therefore, the act of filing does not legitimize a rate arrived at by improper action."  Id.

ORDER – 18

The question remains whether the nonjusticiability strand counsels application of the filed rate doctrine to this case.[10]  As recognized by the Washington Supreme Court in Tenore, preserving the agency's primary jurisdiction to determine the reasonableness of rates is the rationale behind the filed rate doctrine that retains the most vitality.  The pertinence of this rationale, however, hinges on the specifics of the underlying regulatory scheme of the agency.  The court is persuaded that in this instance, neither the Washington Legislature nor the OIC itself intended that the OIC be the single patroller of the lawfulness of title insurance rates.  As discussed above, while the regulatory scheme under the Insurance Code is generally quite comprehensive with respect to insurance rates, title insurance is exempted from this comprehensive scheme.  By contrast, title insurance rates are subjected only to superficial regulation – while the rates must be submitted to the OIC, the Code does not mandate that they receive any review by the Commissioner.  While the Code does provide for a waiting period before the conclusion of which the rates cannot go into effect, this waiting period is even shorter for title insurance rates than it is for regular insurance rates, indicating that review of the rates is not actually anticipated.

Moreover, the Commissioner's regulation on unlawful inducements is keyed precisely to the language of the CPA.  See WAC § 284-30-800.  It is difficult to discern

---

[10]The nonjusticiability strand of the filed rate doctrine overlaps with the primary jurisdiction doctrine, discussed below.  Because courts treat them independently, however, the court discusses them separately.

ORDER – 19

why this language would be so precisely replicated if the Commissioner did not anticipate that such unfair practices could be reached in private actions. If the agency itself did not anticipate that the filed rate doctrine could bar private actions, and if the agency's own rate regulation is non-comprehensive, the court cannot discern how the nonjusticiability justification of the filed rate doctrine would counsel for its application.

Considering the gradual erosion of the rationale for the doctrine, the cautionary note of the Washington Supreme Court in the only case discussing the doctrine, and the uneasy fit between the animating purposes of the doctrine and the facts of this case, the Court declines to extend Washington law to apply the filed rate doctrine to bar Plaintiffs' claims.

**B.      The Primary Jurisdiction Doctrine**

Defendants' argument that the primary jurisdiction doctrine bars Plaintiffs' claims is also unavailing. The doctrine of primary jurisdiction is a "prudential doctrine under which courts may, under appropriate circumstances, determine that the initial decisionmaking responsibility should be performed by the relevant agency rather than the courts." Syntek Semiconductor Co. v. Microchip Tech. Inc., 307 F.3d 775, 780 (9th Cir. 2002). The doctrine is potentially applicable "whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." United States v. W. Pac. R.R. Co., 352 U.S. 59, 64 (1956). The doctrine of primary jurisdiction does not require that

ORDER – 20

"all claims within an agency's purview be decided by the agency," nor is it intended to require the courts to secure expert advice from the agency on every issue that is "conceivably within the agency's ambit." Brown v. MCI WorldCom Network Servs., Inc., 277 F.3d 1166, 1172 (9th Cir. 2002). Rather, the doctrine is properly invoked when such a claim "requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency." Id. No fixed formula exists for applying the doctrine. Id. at 64.

Washington courts have, however, developed a three-factor test for determining when the primary jurisdiction doctrine should be applied. Deference to the agency may be appropriate when:

> (1) The administrative agency has the authority to resolve the issues that would be referred to it by the court. . . .
>
> (2) The agency [has] special competence over all or some part of the controversy which renders the agency better able than the court to resolve the issues; and
>
> (3) The claim before the court [ involves] issues that fall within the scope of a pervasive regulatory scheme so that a danger exists that judicial action would conflict with the regulatory scheme.

In re Real Estate Brokerage Antitrust Litig., 622 P.2d 1185, 1188 (Wash. 1980) (citations omitted); see also United States v. Gen. Dynamics Co., 828 F.2d 1356, 1362-63 (9th Cir. 1987) (setting out a similar, but not identical four-factor test for application of the primary jurisdiction doctrine under federal law).

ORDER – 21

It is clear that the OIC has the authority to reach the conduct alleged by Plaintiffs to have been unlawful.  The Insurance Code provides various mechanisms for enforcement of its provisions.  Indeed, the OIC has executed enforcement actions by investigating the conduct described in the OIC Report, and also indicated its intention to pursue further action.  Rummage Decl., Ex. C at 14 (pledging to "convene a work group to study the issue of title insurance from the consumer's perspective").  However, it is equally clear that any special competence the agency has over this controversy has been exhausted by the agency's concluded investigation and finding that violations of the anti-inducement provisions of the Insurance Code are rampant within the title insurance industry.  As discussed above, the agency's system of title insurance regulation is not so comprehensive that judicial action in the present matter threatens to disrupt it.  Accordingly, the court concludes that the primary jurisdiction doctrine does not bar Plaintiffs' claims.

**C.     The RCW § 19.86.170 Bar**

Defendants argue that Plaintiffs' CPA claims are barred under a Washington statute, RCW § 19.86.170.  The statute provides, in pertinent part:

> Nothing in this chapter shall apply to actions or transactions otherwise permitted, prohibited or regulated under laws administered by the insurance commissioner of this state . . . :
>
> PROVIDED, HOWEVER, That actions and transactions prohibited or regulated under the laws administered by the insurance commissioner shall be

ORDER – 22

subject to the provisions of RCW 19.86.020[11] . . . except that nothing required or permitted to be done pursuant to Title 48 RCW shall be construed to be a violation of RCW 19.86.020.

Defendants argue that because their rates were submitted to the Commissioner and because they were required to charge *only* the rates that they filed, RCW § 48.29.140, their act of charging the filed rates cannot be construed to be a violation of the CPA.

Defendants misconstrue the conduct being challenged in this action. Plaintiffs challenge not Defendants' act of charging the rates that they filed, but the allegedly unfair and deceptive expenditures that led Defendants to charge inflated rates. These practices are specifically prohibited by the provision promulgated by the Commissioner providing that "[i]t is an unfair method of competition and an unfair and deceptive act or practice for a title insurer or its agent, directly or indirectly, to offer, promise, allow, give, set off, or pay anything of value exceeding twenty-five dollars, . . . to any person as an inducement, payment, or reward for placing or causing title insurance business to be given to the title insurer." WAC § 284-30-800. Thus, Plaintiffs challenge conduct that is not "required or permitted to be done" under the Insurance Code; in fact, the challenged conduct is specifically prohibited.

Moreover, Washington courts have long interpreted § 19.86.170 to shield only conduct affirmatively authorized by the agency. Interpreting the 1974 version of the

---

[11]RCW § 19.86.020 is the primary provision of the CPA, providing, "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

ORDER – 23

statute, the Washington Supreme Court disposed of the argument that conduct that is merely acquiesced to by a regulatory agency is shielded from the CPA. <u>Real Estate Brokerage Antitrust Litig.</u>, 622 P.2d at 1187.   The Court held that to claim the .170 exemption, defendants had to "prove that the activity was authorized by the statute and that acting within this authority the agency took overt affirmative action specifically to permit the actions or transactions engaged in by [defendants]." <u>Id.</u>  Subsequent case law is in accord with this interpretation.  <u>See</u> <u>Vogt v. Seattle-First Nat'l Bank</u>, 817 P.2d 1364, 1370 (Wash. 1991); <u>Edmonds v. John R. Scott Real Estate, Inc.</u>, 942 P.2d 1072, 1077 (Wash. Ct. App. 1997).

The conduct challenged by Plaintiffs is not specifically permitted by the agency. However, even if the court were to construe Plaintiffs' challenge as Defendants frame it – to the underlying rates that Defendants filed and were required to charge – the statute still would not bar the challenge.  As discussed in previous sections, given the superficial review of title insurance rates by the OIC, the agency has not given its "specific permission," or executed any "overt affirmative act" of approval.  Accordingly, RCW § 19.86.170 does not bar Plaintiffs' CPA claims.

**D.      Failure to state a CPA claim**

Defendants argue that the complaint fails to sufficiently allege a CPA claim.  To prevail on a CPA claim, a plaintiff must establish the following elements: (1) an unfair or deceptive practice, (2) occurring in trade or commerce, (3) affecting the public interest,

ORDER – 24

(4) injuring plaintiff in his business or property, and (5) caused by the unfair or deceptive act.  Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 719 P.2d 531, 533 (Wash. 1986).

First, Defendants allege that Plaintiffs' claims fail under the fourth element because each Plaintiff does not adequately allege injury to his or her business or property, as opposed to market-wide impact.  Second, Defendants allege that Plaintiffs' CPA claims fail under the fifth element, because their injuries were insufficiently linked to the conduct of Defendants.  The injury and causation elements of a CPA claim can be satisfied by the allegation that a plaintiff lost money because of unlawful conduct.  See Mason v. Mortgage Am., Inc., 792 P.2d 142, 148-9 (Wash. 1990); Schnall v. AT&T Wireless, 161 P.3d 395, 400 (Wash. Ct. App. 2007).

The second amended complaint (the "complaint") alleges: "None of the Plaintiffs knew that his or her title insurance company had paid substantial sums in illegal inducements and referrals to Title Insurance Transaction Middlemen and expended substantial sums in maintaining corporate infrastructure to support the payments of inducements and referrals, all of which caused Plaintiffs financial harm."  Second Am. Compl. at 3.  The complaint details the findings of the OIC Report as to Defendants' significant expenditures in violation of the anti-inducement provisions.  Id. at 7-10. Furthermore, the complaint specifically quotes the language in the OIC that found an

ORDER – 25

obvious link between the expenditures and an increase in the rates that must be charged to

consumers:

> As noted by the Insurance Commissioner: "It is undeniable that these practices cost money, and it's clear that the consumer, who ultimately pays for the coverage, is the only source of money for these illegal expenses." Defendants' unfair and deceptive conduct caused injury to the business or property of Plaintiffs and the Class in an amount to be proven at trial.

Id. at 14.

It cannot seriously be maintained that these allegations fail to adequately plead the

elements of injury to business or property and causation under the CPA.  A complaint is

required only to provide a "short and plain statement of the claim."  Fed. R. Civ. P.

8(a)(2).  The complaint is designed to provide defendants with "fair notice of what the

plaintiff's claim is and the grounds upon which it rests."  Conley v. Gibson, 355 U.S. 41,

47 (1957).  While it is true that Plaintiffs' mere allegations would likely not be sufficient

to show causation at trial, they do not dispute this.  See Pls.' Resp. at 21  (Dkt. # 22)

("[P]laintiffs will demonstrate at trial that middlemen chose their [T]itle [I]nsurers, that

the Title Insurers corrupted the market with an illegal marketing infrastructure, and as a

result, plaintiffs and the class were taken off the market, paid prices inflated by the Title

Insurers' illegal costs, and were deprived access to competitive rates by law-abiding title

insurers.").  Because the court cannot conclude that Plaintiffs can prove no set of facts

that would give rise to relief, Plaintiffs' allegations are sufficient to survive a Rule

12(b)(6) motion.

ORDER – 26

**E.      Statute of Limitations as to RESPA Claims**

Defendants claim that certain of the Plaintiffs' RESPA claims are barred by the statute's one-year statute of limitations.  Plaintiffs argue that this statute of limitations period is subject to equitable tolling, and that the facts necessary to assert equitable tolling are properly alleged in the complaint.  Defendants argue that the statute of limitations is not subject to equitable tolling, and that even if it was, Plaintiffs did not plead it properly.

Claims under 12 U.S.C. § 2607 must be brought within one year from the date of the occurrence of the violation.  See 12 U.S.C. § 2614.  According to the complaint, certain Plaintiffs purchased their title insurance more than a year before the case was filed against Defendants from which they purchased their title insurance.  Thus, unless the RESPA claims are subject to equitable tolling, claims brought by these Plaintiffs will be time-barred.

The preliminary question is whether the one-year period imposed by § 2614 is jurisdictional in nature.  Judge Posner explained the difference between a jurisdictional time limitation and a statute of limitations as follows:

> The practical meaning of a jurisdictional limitation is that the court must enforce it regardless of any agreement between or conduct by the parties; it is not only for their protection.  Statutes of limitations are ordinarily for the protection of defendants and so can be waived or forfeited by them; but they can also protect the courts from the burden of adjudicating old claims.

ORDER – 27

Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1166 (7th Cir. 1997) (citations omitted).  While a doctrine of equitable tolling is read into every federal statute of limitation, Holmberg v. Armbrecht, 327 U.S. 392, 397 (1946), courts are to strictly apply jurisdictional provisions in federal statutes.  Hardin v. City Title & Escrow Co., 797 F.2d 1037, 1040 (D.C. Cir. 1986).

The Ninth Circuit has not taken up the question of whether § 2614 imposes a jurisdictional limitation or one that is subject to equitable tolling.  The Court of Appeals for the District of Columbia held that § 2614 imposes a jurisdictional limitation, Hardin, 797 F.2d at 1039-40, while the Seventh Circuit came to the opposite conclusion. Lawyers Title, 118 F.3d at 1164.  District courts have largely come down on the side of the Seventh Circuit in holding that the one-year limitations period in § 2614 is subject to equitable tolling.  See, e.g., Kerby v. Mortgage Funding Corp., 992 F. Supp. 787, 791-98 (D. Md. 1998); Moll v. U.S. Life Title Ins. Co., 700 F.Supp. 1284, 1286-89 (S.D.N.Y. 1988) (reversing its prior determination that § 2614 imposed a jurisdictional limitation because the court was "strongly convinced that the prior ruling was erroneous"); Mullinax v. Radian Guaranty Inc., 199 F. Supp. 2d 311, 323-34 (M.D.N.C. 2002).  But see Zaremski v. Keystone Title Associates, Inc., 884 F.2d 1391 at *2 (4th Cir. 1989) (unpublished).

In holding that § 2614 imposes a jurisdictional limitation, the Hardin Court largely relied on an inference that because § 2614 also confers jurisdiction on the courts to hear

ORDER – 28

RESPA claims, the time limitation set out in that statute must be jurisdictional in nature. Hardin, 797 F.2d at 1039.  It also analogized § 2614 to a provision in the Truth in Lending Act ("TILA") with virtually identical wording, 15 U.S.C. § 1640(e), pointing out that § 1640(e) has been interpreted to be jurisdictional.  Hardin, 797 F.2d at 1039-40 (citing Rust v. Quality Car Corral, Inc., 614 F.2d 1118, 1119 (6th Cir. 1980)).  Whether Rust actually supports the proposition it was cited for in Hardin has been questioned, Moll, 700 F. Supp. at 1287, and in any case, Rust has since been overruled.  Bartlik v. U.S. Dep't of Labor, 62 F.3d 163, 166 & n.1 (6th Cir. 1995); see also Kerby, 992 F. Supp. at 795.

More importantly, however, the Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as subject to equitable tolling.  In King v. California, 784 F.2d 910 (9th Cir. 1986), the court held that given the remedial purpose of TILA, the limitations period should run from the date of consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate circumstances, suspend the limitations period until the borrower discovers or had reasonable opportunity to discover the fraud or nondisclosures that form the basis of the TILA action."  Id. at 915.  Thus, one of the Hardin court's primary justifications for holding that § 2614 is jurisdictional is inapplicable in this Circuit.

The Seventh Circuit relied on King, and on a similar construction of § 1640(e) outside the Ninth Circuit, in holding that § 2614 is non-jurisdictional and subject to

ORDER – 29

equitable tolling.  Lawyers Title, 118 F.3d at 1164–67.  The court in Lawyers Title noted

that under Supreme Court precedent, "time requirements in lawsuits between private

litigants are customarily subject to 'equitable tolling.'"  Id. at 1166 (quoting Irwin v.

Dep't of Veterans Affairs, 498 U.S. 89, 95 (1990)).  The Lawyers Title court surveyed

decisions holding federal statutes to be jurisdictional, and found them, with the sole

exception of Hardin, only in cases in which the United States was the defendant in the

matter. Id.

        The court is persuaded that the Seventh Circuit has adopted the better construction

of § 2614 as a non-jurisdictional statute.  The Supreme Court has indicated that in

determining whether tolling of the statute of limitations is appropriate, the proper test is

"whether tolling the limitation in a given context is consonant with the legislative

scheme."  Am. Pipe & Const. Co. v. Utah, 414 U.S. 538, 558 (1974).  As is the case with

TILA, permitting equitable tolling in appropriate cases is more in line with the remedial

purposes of RESPA, 12 U.S.C. § 2601.

        Defendants next argue that Plaintiffs have not alleged the facts necessary to

establish equitable tolling.  They assert that equitable tolling is a doctrine that turns on a

plaintiff's ability to show that the defendant fraudulently concealed the actions that form

the basis of the plaintiff's claim, and therefore, in order to preserve the equitable tolling

defense to the statute of limitations, Plaintiffs must allege some fraud on Defendants'

part.  However, Defendants' argument addresses the doctrine of equitable estoppel, not

ORDER – 30

equitable tolling.  The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay by the plaintiff," <u>Johnson v. Henderson</u>, 314 F.3d 409, 414 (9th Cir. 2002), and inquires whether "a reasonable plaintiff would . . . have known of the existence of a possible claim within the limitations period." <u>Santa Maria v. Pacific Bell</u>, 202 F.3d 1170, 1178 (9th Cir. 2000).  Equitable estoppel focuses on the actions of the defendant and requires the plaintiff to show that defendant's conduct prevented her from filing suit. <u>Id.</u> at 1176.  Equitable tolling focuses on the reasonableness of the plaintiff's delay and does not depend on any wrongful conduct by the defendant. <u>Id.</u> at 1178.

Plaintiffs allege that they "could not have reasonably discovered Defendants' unfair and deceptive practices . . . until publication of the Commissioner's Report." Second Am. Compl. at 13.  This is sufficient to establish an affirmative defense against the one-year limitations period in § 2614 such that Plaintiffs' RESPA claims cannot be dismissed on this basis.

**F.      Failure to State a RESPA Claim**

Defendants argue that Plaintiffs fail to state a claim under RESPA.  A plaintiff making a claim under Section 8(a) of RESPA must allege (1) the payment or receipt of a thing of value, (2) an agreement or understanding, and (3) a referral of settlement business.  24 C.F.R. § 3500.14.  Defendants argue that allegations of a generalized pattern or practice of kickbacks does not suffice, and that Plaintiffs' complaint must allege that each Plaintiff's specific settlement business was referred as the result of a

ORDER – 31

prohibited payment.  In support of this proposition, however, Defendants are able to cite

only unpublished decisions from out-of-circuit district courts, and a Ninth Circuit case

that stands for the broader, and undeniable, proposition that "conclusory allegations of . .

. violations are not sufficient to withstand a motion to dismiss."  Ivey v. Board of

Regents, 673 F.2d 266, 268 (9th Cir. 1982).  Without some support for the proposition

that a RESPA claim must be pled with more specificity than Plaintiffs have done, the

claims sufficiently state a basis upon which relief can be granted, and hence survive

Defendants' motion to dismiss.

**G.    Title Insurance Agent Commonwealth**

Defendant Commonwealth argues that it should be dismissed because it is a title

insurance agent, not a title insurer, and as such, only charged Plaintiff Hunt the rate set by

its sister company, Commonwealth Land Title Insurance Company.  However, as

Plaintiffs point out, the Washington insurance regulations are designed to reach the

conduct of title insurance agents, as well as title insurers.  WAC § 284-30-800.

Similarly, RESPA applies to "persons," 12 U.S.C. § 2607(a), a category encompassing

insurance agents.  Despite the fact that Commonwealth could not legally control the title

insurance rates filed and charged by title insurers, it was in a position to affect the rates

filed by its title insurer through its allegedly unlawful expenditures and referral

agreements.  In doing so, it could have contributed to the harm experienced by Plaintiff.

ORDER – 32

Accordingly, Plaintiff Hunt's claims against Commonwealth survive this motion to dismiss.

### IV. CONCLUSION

For the reasons stated above, he court DENIES the motion to dismiss of Chicago Title (Dkt. # 19); the joint motion to dismiss of First Title, Pacific Northwest, Transnation, and Commonwealth (Dkt. # 20); and the joint motion to dismiss of Ticor and Fidelity (Dkt. # 46).

Dated this 8th day of August, 2007.

JAMES L. ROBART
United States District Judge

ORDER – 33